Mr. Swain Good morning, your honors. May it please the court, counsel. We are here today on the appeal of the trial court's granting of summary judgment against Dr. Liu with respect to her claims for, specifically on this appeal. Could you speak up, please? Sorry. Specifically on this appeal, the discrimination and retaliation claims that she alleged in her complaint. As we cited in our brief, and it appears consistent in the appellee's brief, there's not a substantial debate here on the law. I think there was one case where we... Substantial debate on what? The law, the law to be applied. What we do have is an extremely large body of facts. The peer review hearing committee that conducted the hearing in this case had over nine days of testimony, thousands of pages of transcript. But ultimately, what we're looking at, and I think it's, in looking at the appellee's brief, what we see is, if we look at some of the specific issues that were involved, one being that we claimed, obviously, that Dr. Liu was treated differently than... Well, I don't understand that. She was the only one who doesn't like to do surgery for appendectomies, and that was against hospital policy. And why isn't that the end of it? If there was a hospital policy? Well, there was. There was not. You can ask counsel when he comes up if there was a policy with regard to treatment of complicated appendicitis, or any type of appendicitis, with regard to antibiotics. There was no policy. Dr. Liu was granted privileges under the bylaws of the hospital, just like all other doctors. And in order for those privileges... You mean she could do anything? There's no supervision of the doctors? If the doctors are granted privileges to conduct whatever the procedure might be, then the relief that the hospital has with regard to stopping a doctor would be a summary suspension, followed by an immediate peer review committee hearing, which would then go to the executive medical staff, which then, if appealed, would go to a peer review hearing committee, which would then go to the joint conference committee, and then ultimately have to be approved by the board of the hospital. Isn't that what happened? No. That is not what happened. What happened in this case is that Dr. Liu... And it's what they state in their brief at page 32. When they distinguish Dr. Liu from the other comparators in this case that we've cited, their specific statement, the heading of their brief, the plaintiff's insubordination distinguishes her conduct from all of the other surgeons. There is no insubordination for a doctor electing to treat appendicitis with antibiotics. If you don't want that doctor to treat appendicitis with antibiotics, there's a very simple step you have to take. Bring them up on peer review and stop it. You can't send them letters and say, I want you to stop. You can't take informal steps to try to convince a doctor that she's endangering her patients? You can take informal steps, but it wouldn't be fair then to then terminate her or report her to the national... Well, is Poland lying when he's... So they say on November 8, 2007, Dr. Liu promised Dr. Donohue to follow all cases of suspected... in our institution received surgery. And four days later, Madura wrote Donohue about his review of three more appendicitis cases Dr. Liu treated non-operatively that should have been operated on immediately. And then there's more of this on November 16, November 21, January the following year. Are all this lies? Those are not lies, no. But it's... What's the but? Well, take a look at what Rush Presbyterian did. What did Rush Presbyterian do? What did the hospital that wasn't being accused of retaliation do? They ordered a peer review. They had her proctored so that if she wanted to treat someone with antibiotics, she would have to get that authority from the proctoring surgeon. What's the relevance of Rush Presbyterian? Because what it shows you is what could have been done, what should have been done, versus what was done. I don't know what you mean by should have been done. Do all hospitals have to have the identical procedures for dealing with an insubordinate employee? Well, one, we take issue with the fact that she's insubordinate. But second, most, I'd say the overwhelming majority, do have bylaws that provide for how to deal with doctors who have been granted privileges to perform certain procedures, but for whatever reason might need reeducation or some other thing with regard to how they're doing it. Wasn't she doing some sort of a research project, advocating her method? No. She wrote a paper, and she's written many papers since, and the literature since she has left Stroger is overwhelmingly supporting antibiotic treatment of complicated appendicitis. Wherever she went, she's doing this all the time. She wasn't doing research. What's that? Wherever she went after she left Cook County, she continued to write on it and, I assume, practice. Yes. So she's continued to do these, whatever you call it, without doing an operation in the antibiotic method. Right. It's essentially antibiotic treatment. But the reality is, they acknowledge that antibiotics... Now, you say Rush Presbyterian does it differently, but what about Stroger? How does it handle other problems with its doctors? It's a great point that the Court brings up, and in that very section, the appellees go through it, and they talk about what they did with the other comparators that we listed. Specifically, they say at page 35 of their brief, with regard to Dr. Okoa, last sentence, he agreed to give up this type of surgery and remains at the hospital as a thoracic surgeon. With regard to Dr. Donahue, the fact is that Dr. Donahue was referred to the SOC, but he gave up this type of surgery, so there was no need for corrective action. There are an abundance of things that could be done in this case. The first would be, as the Court says, come up with a policy. Now, as you'll note in our brief, we refer to it, I guess, as a bathroom deal, and maybe that hyperbole shouldn't have been used, but the reality is what happened is the director of the hospital and the chairman of the credentialing committee came to Dr. Liu and said, listen, if you will agree to this policy that we're providing to you right here that says all noncomplicated cases of appendicitis will be treated surgically, will you go by that? She said, yes, I will. And then they said, well, I think we can get Dr. King, the chair of surgery and one of the defendants in this case, to go along with it as well, since that would be an accepted approach. Dr. King said no, he wouldn't agree to that policy because he wanted Dr. Liu to admit that in previous cases where she had treated antibiotically that there were adverse outcomes. Was there any doubt about that fact? I think what Dr. Liu would point out and what she pointed out in the hearing committee was that the risks and the adverse outcomes from antibiotic treatment are no greater or lower than antibiotic treatment. Well, how about Diane Buckey? Certainly, Diane Buckey is a case where Dr. Liu, I mean, there's an argument for Dr. Liu asserts that there was no malpractice in that case. She wasn't allowed to defend that case. She didn't defend that case. The state did. Sandoval? Sandoval, the intensive care specialist, the physician who was in intensive care at the time, came out and said, no, it was not as a result of antibiotic treatment. It was the fact that the residents filled this person up with fluid, 20 liters of fluid. What percentage of the doctors at Stroger are Asian or black? There is a very diverse population. That doesn't answer my question. I don't know the specific numbers with regard to the physicians at Stroger. I do know it's a diverse population of people. It seems pretty improbable that they'd be discriminating against Asians. It might, but to that point, they've cited 10 cases. A lot of the doctors are women, right? Well, they cite in their brief, they say 10 cases have gone to peer review, which have led to an adverse outcome, adverse employment action for the physician at Cook County Hospital since 2003. Eight were men. Two were women, one being Dr. Liu. The other woman was a pathologist named Dr. Vivian Renta. They're all foreign, aren't they? Well, Dr. Vivian Renta brought a retaliation case in the Northern District of Illinois against Stroger Hospital, which in 2012, the only other woman. I'm just asking how probable it is that they would discriminate against women or Asians given that those are such a large part of their medical staff. Well, in the Department of Surgery, they're not. They're not as much as predominantly male. But what I would also point out, however, is in the 10 cases that they cite... How many of their surgeons are female? I think there's 14. Pardon? 14, I think. Sounds like a lot. Well, in the one case out of the 10 cases... How many surgeons are there altogether? Upwards of 70-something, I believe. Pardon? I believe it's upwards of 70, but I don't know for certain. 70 surgeons? Yeah. Wow. What I would point out, that of the 10 that did go to peer review, two being women, one sued for retaliation and won $7.6 million going through this exact same process in 2012. The exact same process. She was Puerto Rican. She alleged discrimination, retaliation. So percentage-wise... What conclusion do we draw from that? Well, what we draw from that is that if someone comes in here and says, you can rely on this process because there are lots of foreigners and women and men, this process has been abused before. It was abused here. The peer review committee chair, while he was reviewing the case, was accused of improper touching of other employees and patients, and he was allowed to decide the case. He didn't reveal that to anybody. They didn't reveal that to anybody. She was being prosecuted by the people she was accused to this man... Well, not Kina Maduro. Kina Maduro were charged by her. By her. Yes. But Dr. Levine, who was the actual chair of the committee, left the hospital, resigned, after he was given the ultimatum, either we're going to bring you up on this charge or you need to quit because you've been touching people that you shouldn't. Now that's the person that decided this and sent it back to the EMS and said, no, we find none of this persuasive. Mr. Sweeney, I'm troubled by the evidence that Dr. Liu responded in this formal process by saying she was entitled to treat patients any way she saw fit. Is that her response? Did she say that? I don't know if she said it exactly like that, but in the context of within the standard of care is what Dr. Liu means. She does not mean... I mean, this is a doctor that her credentials are impeccable. University of Chicago, St. Lou down in Missouri. She taught five schools across the board. She was chairman of the Surgical Oversight Committee of herself for five years. What went on here was such an abuse of this. Well, one of the things that troubles me about this case, we're talking here about the county hospital. I assume for most patients in this city that's a hospital of last resort. Is that right? I believe it is. And if you're a doctor who believes that another doctor is persistently, consistently pursuing a course of treatment that endangers patients, there are so many legal protections in place that, frankly, patients can be injured or worse while the legal processes are working through. Not in this case. They could, as they did, they summarily suspended her. Now, Dr. Liu... Well, after several years of a much, much lower rate of surgery on acute appendicitis, right? That's 100% disputed. They cite 41% as the number of cases that she treated nonoperatively. That is absurd. We asked them for the proof of that study, the 41%. One, they had it done by a gentleman who's not a doctor, who they don't know his last name. Two, they don't have the records. They don't have any of the records of any of the patients that they say she treated nonoperatively to constitute that 41% study. But yet they cite it in this brief. Yes, I would agree with you that if you're going to seek to protect patients that are coming to the hospital, you need to do that. And there's a way to do it. And you don't generally wait. I mean, why would you? I mean, just ask yourselves. Would you really send 10 memos on this if you thought you were really involving patient care? If you thought the doctor was responding and promising to change her approach and you thought that would be a far faster, more effective, and cheaper course than going through full-blown litigation for years? Yeah. There'd be no litigation with Procter. None at all. All you have to do is say, you're going to be Procter. Peer review committee will say, yes, she will, because that's what the chair of the department said. And for the next 12 to 18 months, then that's what will happen. Every case that she reviews where she decides to treat someone antibiotically would have to be approved by another surgeon. You don't wait 10 times. Okay, thank you, Mr. Sprague. Thank you. Mr. Creighton. Good morning. I'd just like to address one of the remarks of counsel here about the treatment of patients with antibiotics and not, and the files regarding those patients. There were 19 of those patients' files that were produced during the peer review hearing in front of the peer review committee, and that's in the record in the charts there. Charts were part of that record before the hearing committee. So this idea that all of this analysis of Dr. Liu's treatment of antibiotics wasn't supported by medical records isn't accurate. Indeed, it was during the hearing committee. The three-person hearing committee, including, and also the executive medical staff hearing before and after the three-person hearing committee, had access to all those medical records. So what's the basis for the 41% number? That was an analysis compared to other cases that she handled, and that's how Madura came up with the 41% when he analyzed the number of cases that she looked at. And what's the state of the evidence on that question? Just Madura's, he gave his just one-page result that he presented to the hearing room committee, to the hearing committee, with his analysis of the results, and then he presented, and then they actually presented 19 of the cases. Mr. Sweeney said that there's no record of this person's last name who conducted the 41% study? Just the record. There's a one-page record that he presented to the hearing committee on it. Does he have a last name? Madura. Okay. Because, as I say, Mr. Sweeney said that his last name is nowhere. It was Dr. Madura's study. Dr. Madura testified before in the hearing committee.  That's who provided that information. I'd like to go back to this whole issue of objectivity and just go back to the point of where Keane's coming from on this. Keane was chair of the Department of Surgery. Back as early as 2001, he was aware of a patient at Stroger who died, not a Lou patient, Stroger, who had died for not getting treatment or not getting surgical treatment with appendicitis. At that time in 2001, he wrote a memo to the department and to the emergency room that when we've got an abdominal case, it needs to go to surgical consult to see if he needs a surgery or not. So Keane's aware of this back as early as 2001 as to an objective standard as to the treatment of appendicitis. Mr. Sweeney's right. There isn't a statute or a regulation in the hospital that says you've got to treat appendicitis with surgery. What the physicians do is they apply what they consider the standard of care for the treatment of the disease, accepted standard of care throughout the United States, and certainly in Stroger during this relevant period has been you treat this disease with appendicitis. Objectively, look what happened to Keane in this case. Not only did he have Dr. Lou promise to operate in that memo that Judge Bosner cited to in November of 2007, she again did it in May of 2008. Again, it came up. She again wrote in writing, I'm going to operate on these cases. This is in June of 2008, May or June, excuse me. The next thing that happens to Keane is he gets called by the risk department. Keane doesn't go investigate Sandoval on his own. Hospital reviews the intensive care admissions of patients to ICU for intensive care unit for appropriateness. A 20-year-old healthy male who's otherwise there for a simple appendectomy should not end up in the ICU with respiratory failure and full-body sepsis. Keane's called by risk to go in. You've got to look at this patient. He shouldn't be here. Keane goes in and looks at him and sees what happened. There was a delay of 31 hours in the treatment by Lou, and he said in his deposition his reaction was she did it again, and she had just promised not to. That's when he made the decision to start counseling, to get counseling on whether he should summarily suspend her at that point. He had an objective basis to make the decision to suspend, and later on an objective basis by the recredentialing committee in regards to the credentialing issue, not only on the appendicitis cases, but as the court has pointed out already, her attitude at that time was, I can treat anybody the way I want. I'm a fully credentialed doctor. Now at what point do the doctors have to say enough is enough and we've got patients in danger? You've got Medora's letter to Donahue in the appendix, and there where he says it's just a matter of time before a tragedy occurs. Then on the objective standard here, let's talk about Diane Buckey for a second. I'm sure in the record you go to 2333. It's the ambulance report where Diane Buckey has now been discharged for six days from Stroger Hospital. Her friend calls the ambulance. The ambulance comes. She's now been six days without treatment for appendicitis. The ambulance comes, and you go to the blood pressure column on that page. They can't even find a blood pressure at this point. She's near death. She's almost ready to die because she doesn't have blood pressure. The only reason she didn't die is because the ambulance started pumping her full of fluids and treatment to keep her alive to get her over to Palos Community Hospital where she underwent the emergency appendectomy. The medical records are in the record in this case. There was so much pus and destruction at that point, they couldn't even find the appendix. It's in the record. They had to remove part of her bowel as part of the operation. This case came in also to Keene through risk, risk response to lawsuits. They sent them to the department chair. During the peer review process, a Buckey lawsuit came in, and Keene then included that in the peer review process as another one of these cases where a patient was severely damaged and endangered by loose behavior. There was objective basis both by Keene and by the other defendants in this case in the hospital and the various departments in deciding that these were necessary steps in regards to this particular doctor. In regards to this idea she wasn't insubordinate, the peer review committee, both of their reports, which by the way included a black female physician who testified then subsequently before both the peer review later on and also the joint conference and the board of directors meeting, referred to the fact that she was disobeying the directives of the department in regards to the treatment of this disease. So there's just objective basis over here. I mean, at what point doesn't the doctors have to be responsible? They don't have to wait until somebody dies. They have to be responsible to these patients, and throughout this record there's no reference to loose race or national origin. There's conference, when you look through the chart here, there's just one reference after another to the fact that they're worried about patients in this case. This is a huge hospital, and appendectomy is a common procedure. I would just point out in regards to Judge Posner's question as to what are the racial make-downs of the various components of the surgical department or the hospital. I can't tell you what it is for the hospital, but I broke down for you in the record, and you have it there, is the breakup of each of those peer review committees by sex and national origin to the best we could figure out from the record. And you're going to see in each of those, the EMS, the executive medical staff, is made up of the chair of various departments, and then each department elects a person, another physician. It's just physicians on the medical staff, the EMS, just physicians. Those are representative of each of the departments in the hospital. It's really diversified. You can't imagine a more diversified place. I did break that down for you so you can see what the votes were on the number of women. It doesn't give you names on all of those as to how they voted, but it does give you totals. And obviously there were substantial numbers of women who do female positions during the various process here that voted against Dr. Lew and made the determination that the appropriate sanctions that were being imposed were appropriate. So these are doctors judging doctors, and that's what we have in this case. If the doctor has full privileges, is it totally discretionary? Is it a person can unilaterally decide to do these things without... No, they are still subject to supervision by their department. And each of the three named defendants in this case, Donahue, Madure, and Keene, were supervisors in the surgery department in various capacities, and she had an answer to them. And it was their responsibility to impose what they considered the standard of care for this disease, which is appendectomy. So she can't override that because she has full privileges? Correct. And that's the insubordination issue, and you'll see it throughout the record and referenced by the Joint Hearing Committee about the insubordination where she just would constantly not follow the directive. I think I've covered things to the extent I wanted to. I just want to make one comment. When I was reading the reply brief, it seems like we're back to addressing the issue of due process, and that issue was not preserved for appeal. It was count 12, and it wasn't subject to appeal before this court, so it wasn't addressed thoroughly as it was in the district court for that reason. Thank you. If you don't have any questions, that concludes my remarks. Thank you very much, Mr. Perry. Mr. Sweeney, you can have another minute or two if you'd like. Thank you, Your Honor. One, the statement that counsel just provided with regard to whether or not a supervisor can direct a surgeon with full privileges to treat a patient in a certain way, they cannot. Absolutely not true. If you want to restrict the privileges of a physician who has been granted privileges, there is one way to do it, peer review. That's it. There's also the possibility, though, of an informal consultation, right? Certainly. And if you get a promise to change ways, then you would not go forward at that time with the formal processes, right? That is also true. But what we would point out is that in every one of the cases where they came forward and said that doctor – because what she promised to do was to not treat or to operate on appropriate cases, essentially that's what it came down to. Wait a minute. You're saying she promised, in essence, I'll just do what I think is appropriate? She said that on – they agree. It's in their brief. They flat out say it. In 2% to 3% of cases you can treat with antibiotics. She said, I will do that. That's what she promised to do. Can you direct us to specific evidence in the record on this point? I think they agree with it. I mean, they cite it in their book. She agreed to do that. The fight then became, was that actually a case of complicated acute appendicitis? The way you determine whether you have complicated acute appendicitis, the gold standard for determining complicated acute appendicitis is a CT scan, a radiologist. A radiologist comes in and says, yes, you have a phlegmon. You can treat that or you should treat that with antibiotics. Radiologist decides that issue. In every one of the 19 cases that they brought forward, the radiologist said, yes, there was a phlegmon. It should be treated with antibiotics. There was also Dr. Fred Luchette from Loyola who came in and said, yes, she met the standard of care with every one of those cases. Now, I'd point out, he said 19 cases. So they screwed up, not her. No, it's not a screw up. Well, somebody got seriously damaged. No, in those 19 cases, most of those cases, nothing happened at all. Nothing happened at all in those cases. They've got two cases where something happened. In the first case... Look, you said earlier that the supervisor, the senior person, whoever, could not tell a doctor who had full privileges not to do something? Couldn't tell a doctor with privileges what the standard of care was. I don't believe you. If you're a supervisor and you see one of the doctors about to do something dangerous to a patient, you forbid that. You don't wait for some peer review committee to assemble. Right. You'd go get a summary suspension if you believe that was true. Of course. Right. They can do that. They didn't do that. You said they couldn't. I said they could go get summary suspension. I said they couldn't send someone an email or a memo saying the standard of care is surgery when they admit in their brief that the standard of care is not surgery. The person whose name they don't know is the person who actually did the study. Dr. Madura provided a one-sheet piece of information that said 41 percent, provided no details as to who the patients were or how long it went on. We know she treats 40 to 50 patients for appendicitis every year. According to them, that would be an astronomical number of appendicitis cases treated with antibiotics, and that didn't happen. In terms of the individual who almost died in the intensive care unit, yes, that's what happens when you treat someone with 12 liters of fluid overnight. What happened to that patient, they won't tell you. The next five days he walked out of the hospital, not because he had an appendectomy, but because he got overloaded with fluids. Okay. Thank you, Mr. Strain. Thank you. And thank you, Mr. Creighton. Next case for argument.